(219 P.3d 857)
No. 101,416

LELAND KENT SHAW, *Appellant*, v. SOUTHWEST KANSAS
GROUNDWATER MANAGEMENT DISTRICT THREE, *Appellee*.

Opinion filed November 20, 2009.

*Alan L. Rupe, Stacia G. Boden,* and *Jason D. Stitt,* of Kutak Rock, LLP, of Wichita, for appellant.

*Brian C. Wright,* of Law Office of Brian C. Wright, of Great Bend, for appellee.

Before MALONE, P.J., GREEN and MARQUARDT, JJ.

MALONE, J.: Leland Kent Shaw appeals the district court's order granting summary judgment to Southwest Kansas Groundwater Management District Three (GMD) on Shaw's retaliatory discharge claim. For the reasons stated herein, we reverse the district court's order granting summary judgment and remand for further proceedings.

GMD is an organization created pursuant to K.S.A. 82a-1020 *et seq.* to ensure the proper management and conservation of Kansas' groundwater resources. Water users within GMD's district are not to allow "waste of water." K.A.R. 5-23-2. One of the definitions of "waste of water" is "the escaping and draining of water intended for irrigation use from the authorized place of use." K.A.R. 5-1-1(gggg)(3). Pursuant to K.A.R. 5-23-11, if a representative of a district finds that a water use violation exists, "the representative shall issue a written directive to the violator stating the nature of the violation and directing the violator to come into compliance with these rules and regulations."

GMD is governed by a board of directors (Board). See K.S.A. 82a1027. The Board employs an executive director to manage the day-to-day operations of the district. From 1994 to 2001, Steve Frost served as GMD's executive director. In June 2001, Steven C. "Hank" Hansen became GMD's executive director and was given a 3-year employment contract. On March 3, 2004, Hansen wrote a letter to the president of the Board, Brant Peterson, asking

for a pay raise and an extension of his employment contract for another 3 years.

Shaw was hired by GMD in 1990 and worked as a conservationist. One of Shaw's duties as a conservationist was to perform field investigations regarding alleged waste of water violations. From 1994 to 2001, Frost supervised Shaw. Without exception, Frost evaluated Shaw's performance as "exceptional" and routinely recommended Shaw for salary and position advancements. When Hansen replaced Frost as GMD's executive director in 2001, Hansen continued to evaluate Shaw as an exemplary employee. Hansen performed Shaw's last performance evaluation in November 2003. Hansen commented that "Kent [Shaw] continues to exceed my expectations in job performance in a very satisfactory manner. Kent manages his projects well and keeps me informed about anticipated problems." In that same evaluation, Hansen encouraged Shaw to continue his diligent efforts in policing water violations and wrote: "It's difficult to think of anything Kent needs improvement on . . . . Please continue to be passionate about truth and justice. Your efforts continue to have a positive impact on society." Finally, Hansen reassured Shaw that he expected Shaw to "enjoy a long and productive career with the District."

On March 17, 2004, Shaw observed evidence that he believed constituted a waste of water from farmland operated by Peterson, the Board's president. Shaw observed water runoff from the field into the adjacent roadway caused by the field's irrigation system. No effort was made to prevent the waste of water or to retain the water on the land with a berm or a dike. Shaw called his office and notified Janet King, a GMD employee, of the violation and its location. King apparently informed Hansen of Shaw's finding because when Shaw returned to the office, Hansen told Shaw that he did not want Peterson to receive a formal notice about the violation. Hansen sent an e-mail to Shaw and King in which he explained that he had contacted Peterson about the water drainage problem. Hansen stated that because Peterson was aware of the situation and was on course to remedy the problem, Hansen did not want a legal notice filed against Peterson.

In early April 2004, Shaw told Shirley Spanier, a former GMD employee, about Hansen's order prohibiting him from sending notice to Peterson. Spanier contacted several members of the Board and told them she believed it was wrong for Hansen to refuse to issue a notice to Peterson. The Board decided to investigate and asked Shaw to meet with the Board's executive committee on April 30, 2004. At the meeting, the parties discussed Peterson's alleged waste of water violation and how Shaw did not agree with Hansen's handling of the situation. According to Shaw, Peterson admitted at the meeting that a violation had occurred and that he expected to receive a notice. The executive committee also met separately with two other GMD employees and with Hansen to discuss employee complaints. During the investigation, the Board suspended Hansen's ability to hire or fire employees because the Board was concerned Hansen might fire Shaw over his complaint. According to Board member Clay Scott, after the investigation was completed the Board directed Hansen to correct his management style.

On June 30, 2004, soon after the Board lifted Hansen's ability to hire or fire employees, Hansen fired Shaw without warning, effective immediately. Hansen gave Shaw a termination letter and an evaluation documenting four deficient job performances or misconduct by Shaw and stating that Shaw had shown a disregard for the authority of the executive director. In the Board meeting following Shaw's termination, Board member Thomas Bogner requested an explanation for Shaw's termination and he wanted the reasons for Shaw's termination to be incorporated into the minutes. However, Bogner withdrew his request at the following meeting "for the sake of trying to have the Board get along again."

On October 21, 2005, Shaw filed a petition against GMD for retaliatory discharge. The petition alleged that Shaw was terminated in retaliation for his actions that constituted protected internal whistleblowing. Specifically, the petition alleged that Hansen fired Shaw because he had complained to the Board about Hansen's order prohibiting him from sending notice to Peterson about his waste of water violation. GMD filed a motion for summary judgment and argued that Shaw's actions were not whistleblowing,

or if they were, Hansen did not violate clearly defined and applicable rules, regulations, or laws.

The district court granted GMD's motion for summary judgment, ruling that Shaw's complaint did not constitute whistleblowing. The district court found that under Kansas law "a report must be made to an outside agency in order to qualify as whistle blowing." The district court further found that Shaw's complaint "was never made to an outsider who had any capacity or authority to rectify the alleged wrongdoing." Shaw timely appealed.

On appeal, Shaw argues the district court erred in granting GMD's motion for summary judgment. Shaw argues that the district court erred in denying his claim based on his failure to report the alleged wrongdoing to an outside agency. He argues that internal whistleblowing is actionable under Kansas law. GMD concedes this point but urges this court to affirm the district court's decision as right for the wrong reason.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences that reasonably may be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

Kansas follows the common-law employment-at-will doctrine, which allows an employer to terminate an employee for good cause, no cause, or even for wrongful cause. To prevail on a retaliatory discharge claim, an employee must demonstrate that he or she falls within one of the exceptions to the employment-at-will doctrine. One of those exceptions is termination for whistleblowing. *Good-*

*man v. Wesley Med. Center,* 276 Kan. 586, 589, 78 P.3d 817 (2003). Our Supreme Court first recognized the whistleblower exception in *Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685 (1988), in which the court determined that termination of an employee in retaliation for the good-faith reporting of a serious infraction of rules, regulations, or the law pertaining to public health and safety and the general welfare by a coworker or an employer to either company management or law enforcement officials is an actionable tort.

A burden-shifting analysis is applied to whistleblowing retaliatory discharge claims. The employee must first make a prima facie case of retaliatory discharge based on his or her report of wrongdoing by providing clear and convincing evidence that (1) a reasonably prudent person would have concluded that the employer or a coworker was engaged in activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare; (2) the employer had knowledge that the employee reported the violation prior to his or her discharge; and (3) the employee was discharged in retaliation for making the report. In addition, the employee must prove that any whistleblowing was done in good faith based on concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain. If the employee establishes a prima facie case, the burden shifts to the employer to present evidence that the employee was terminated for a legitimate reason, at which point the burden shifts back to the employee to provide evidence that the reason given by the employer was pretextual. *Goodman,* 276 Kan. at 589-90.

Here, the district court did not reach the burden-shifting analysis because it ruled that Shaw's report did not constitute whistleblowing. The district court found that under *Palmer,* a report must be made to an outside agency in order to qualify as whistleblowing. The district court further found that Shaw's complaint was never made to an outsider who had any capacity or authority to rectify the alleged wrongdoing.

The district court's conclusion that under *Palmer,* a report must be made to an outside agency in order to qualify as whistleblowing

is incorrect. *Palmer* does not say that a report must be made to an outside agency. In fact, *Palmer* states that "termination of an employee in retaliation for the good faith reporting of a serious infraction . . . by a co-worker or an employer to either *company management* or law enforcement officials (whistle-blowing) is an actionable tort." (Emphasis added.) 242 Kan. at 900.

The question of whether internal whistleblowing can support a cause of action for retaliatory discharge was also addressed in *Moyer v. Allen Freight Lines, Inc.*, 20 Kan. App. 2d 203, 885 P.2d 391 (1994). In *Moyer*, the majority of the court determined that under *Palmer*, a retaliatory discharge claim could be brought on allegations of internal whistleblowing to company management. 20 Kan. App. 2d at 208. A petition for review was granted in *Moyer*; however, the case was settled and dismissed before the Kansas Supreme Court reached a decision on the merits. 20 Kan. App. 2d at 203.

Our Supreme Court addressed the issue of internal whistleblowing in *Connelly v. State Highway Patrol*, 271 Kan. 944, 969, 26 P.3d 1246 (2001), *cert. denied* 534 U.S. 1081 (2002). In *Connelly*, the plaintiffs were highway patrol troopers who claimed they were terminated in retaliation for whistleblowing after they openly protested within their chain of command about alleged illegal activity committed by the department. The *Connelly* court analyzed decisions from other jurisdictions to determine whether a claim for internal whistleblowing should be allowed. Ultimately, the court held that

"[w]hile there are good reasons to retreat from the broad language of *Palmer*, and certainly not every instance of internal complaint should be actionable whistleblowing, we hold here that the actions of the troopers in openly denouncing and protesting within their chain of command to other 'law enforcement officials' illegal activity in not enforcing laws designed for public safety may be protected internal whistleblowing and was correctly submitted to the jury for its determination." 271 Kan. at 974.

Thus, internal whistleblowing is recognized as an actionable tort in Kansas at least in some circumstances. GMD concedes that the district court erred in ruling that a report must be made to an outside agency in order to qualify as whistleblowing. Nevertheless,

GMD urges this court to affirm the district court's decision as right for the wrong reason. GMD provides three reasons why the district court was correct in granting summary judgment in GMD's favor: (1) the whistleblower must complain to a party with the authority to rectify the problem, and here the Board did not have the authority to force Hansen to rectify Shaw's complaint; (2) the subject matter of Shaw's waste of water report did not concern a serious infraction of a clearly defined public policy; and (3) Hansen's decision to withhold the written directive against Peterson was discretionary and, therefore, not a violation of K.A.R. 5-23-11. We will examine each argument in turn.

GMD states that *Fowler v. Criticare Home Health Services, Inc.*, 27 Kan. App. 2d 869, 10 P.3d 8 (2000), *aff'd* 271 Kan. 715, 26 P.3d 69 (2001), stands for the proposition that a whistleblower complaint must be made to someone with "the authority to rectify the problem." In *Fowler*, the plaintiff worked for the defendant as its shipping manager. When the general manager of the company asked the plaintiff to ship two handguns and live ammunition to the owner of the company, the plaintiff refused stating that he believed it was unlawful to ship the guns. The plaintiff further stated that if the company shipped the guns, he would report the alleged violation to the United Parcel Service (UPS). While the plaintiff was gone from the building making deliveries, the manager shipped the guns and ammunition through UPS. The plaintiff later reported the alleged violation to UPS without telling anyone at the company that he had done so. The next day, the plaintiff was late to work, and the manager suspended him without pay and eventually terminated his employment. The plaintiff filed suit alleging retaliatory discharge, but the district court granted summary judgment in favor of the defendant.

On appeal, the court affirmed the district court's decision granting summary judgment. The court reasoned that not "every workplace dispute over the water cooler on company practices" equates to whistleblowing. 27 Kan. App. 2d at 876. Instead, the court held that only those employees who seek to stop unlawful conduct though the intervention of a higher authority, either inside or outside the company, are protected from retaliatory discharge for

whistleblowing. 27 Kan. App. 2d at 876. The court also based its decision on the fact that the defendant was not aware that the plaintiff had reported the manager's conduct to UPS when the manager terminated the plaintiff, and the court found that the mere threat of whistleblowing was insufficient to sustain a claim of retaliatory discharge. 27 Kan. App. 2d at 875-77.

Thus, contrary to GMD's assertion, *Fowler* does not provide that a whistleblower's report must be made to a party with the authority to rectify the problem. The critical point in *Fowler* is that the whistleblower must seek to stop unlawful conduct through the intervention of a higher authority, either inside or outside the company. 27 Kan. App. 2d at 876. Stated differently, internal whistleblowing is recognized as an actionable tort in Kansas in circumstances where the employee seeks to stop unlawful conduct pertaining to public health and safety and the general welfare by a coworker or an employer through the intervention of a higher authority inside the company.

Here, GMD's argument that Shaw's report to the Board was the same as complaining to a coworker at the water cooler ignores the obvious hierarchical relationship between the Board and Hansen. It is undisputed that the Board had the power to renew Hansen's employment contract. Shaw's complaint to the Board was made at the same time Hansen was renegotiating his employment contract and seeking a pay raise from the Board. The obvious inference is that Hansen did not want Shaw to report the violation while Hansen was renegotiating his employment contract. Shaw satisfied the requirements of *Fowler* by seeking to stop Hansen's alleged unlawful conduct through the intervention of a higher authority inside the company.

Next, GMD argues that the subject matter of Shaw's waste of water report did not concern a serious infraction of a clearly defined public policy. GMD argues that Shaw exaggerated the significance of the water runoff on the farmland operated by Peterson. GMD maintains that nothing in the record indicates that the amount of the water runoff was significant or dangerous, except for Shaw's testimony that the runoff presented a safety hazard.

This argument fails for two reasons. First, GMD does not cite any evidence in the record that the water runoff did not constitute a safety hazard. Therefore, Shaw's testimony that it was a safety hazard is undisputed. In a motion for summary judgment, the district court is required to resolve all facts and inferences that reasonably may be drawn from the evidence in favor of the party against whom the ruling is sought, which in this case means that the district court must resolve the dispute in Shaw's favor or, alternatively, as a disputed matter of fact precluding summary judgment. *Miller*, 288 Kan. at 32.

Second, Kansas has a strong public interest in groundwater management and preventing groundwater waste in the form of runoff. In K.S.A. 82a-1020, the legislature declared that

"a need exists for the creation of special districts for the proper management of the groundwater resources of the state; for the conservation of groundwater resources; for the prevention of economic deterioration; for associated endeavors within the state of Kansas through the stabilization of agriculture; and to secure for Kansas the benefit of its fertile soils and favorable location with respect to national and world markets. It is the policy of this act to preserve basic water use doctrine and to establish the right of local water users to determine their destiny with respect to the use of the groundwater insofar as it does not conflict with the basic laws and policies of the state of Kansas."

Finally, GMD argues that K.A.R. 5-23-11, which sets forth the procedure for handling noncompliance with the groundwater rules and regulations, provided Hansen with the discretion to determine whether to file a written directive against Peterson concerning the waste of water violation. K.A.R. 5-23-11 states in relevant part:

"The district, its board or manager, any eligible voter within the district, or any person residing within the district that is at least eighteen (18) years of age, may file a written complaint with the district alleging a violation of these rules and regulations, the management program, the groundwater management district act (K.S.A. 82a-1020 *et seq.*), or the water appropriation act (K.S.A. 82a-701 *et seq.*). The written complaint shall be filed at the district office.

"Within thirty (30) days following the filing of the complaint, a representative of the district designated by the board shall investigate the complaint. If the representative of the district finds that a violation has existed or presently exists, the representative *shall issue a written directive to the violator* stating the nature of the violation and directing the violator to come into compliance with these rules and regulations." (Emphasis added.)

While it is true that a party *may* filed a written complaint with the district alleging a water use violation, the plain language of the regulation clearly states that once the representative of the district finds a violation, the representative "shall issue a written directive to the violator." K.A.R. 5-23-11. Here, Shaw personally observed water runoff from Peterson's field into the adjacent roadway caused by the field's irrigation system. Shaw completed his investigation and reported the violation to the office. Once Hansen became aware that a violation existed, the decision whether to issue a written directive to Peterson was not discretionary. At that point, the regulation required either Hansen or Shaw to issue a written directive.

Alternatively, GMD contends that its employees had a legitimate disagreement about how to apply the rules and regulations. GMD points to the fact that Hansen sent an e-mail to Shaw and King in which he explained that he had contacted Peterson about the water drainage problem. Hansen stated that because Peterson was aware of the situation and was on course to remedy the problem, Hansen did not want a legal notice filed against Peterson about the violation.

This argument ignores the fact that once a representative of the district found that a violation existed, the representative was required to issue a written directive to the violator. Here, there appears to be no question that Shaw had found a waste of water violation on the farmland operated by Peterson. According to Shaw, Peterson admitted at the executive committee meeting that a violation had occurred and that he expected to receive a written notice. The record before the district court belies GMD's assertion that its employees had a legitimate disagreement about how to apply the rules and regulations.

In summary, the district court erred by concluding that under Kansas law, a report must be made to an outside agency in order to qualify as whistleblowing. Each of GMD's alternative arguments that the district court was right for the wrong reason in granting summary judgment is without merit. Accordingly, we reverse the district court's order granting summary judgment in GMD's favor and remand for further proceedings.

Reversed and remanded.