**Gary ANDERSON, Appellant,**

v.

**INT'L ASSOC. OF OPERATIVE MILLERS, Respondent.**

**No. WD 72082.**

Missouri Court of Appeals, Western District.

Dec. 21, 2010.

tle a line 11 adjustment."

Reginald C. Giffin, for Appellant.

Vaughn Burkholder, for Respondent.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

VICTOR C. HOWARD, Judge.

Gary Anderson appeals the trial court's grant of summary judgment in favor of the International Association of Operative Millers ("IAOM") on his retaliatory discharge claim. On appeal, Anderson contends that the trial court erred in granting IAOM's motion for summary judgment because genuine issues of material fact existed as to whether: (1) Anderson's report of a

potential antitrust violation to the president of IAOM constituted actionable whistleblowing; (2) his employment was terminated in retaliation for whistleblowing; and (3) those who terminated his employment had knowledge of his whistleblowing. The judgment of the trial court is affirmed.

### Factual and Procedural Background

Gary Anderson filed a petition against his former employer, IAOM, alleging that IAOM terminated his employment on May 30, 2007, in retaliation for Anderson's report of a potential antitrust violation by one of IAOM's committees. Anderson, who was the executive vice president of IAOM, alleged that he reported the violation to James Doyle, IAOM's president at the time. According to Anderson's petition, Doyle then engaged in a pattern of retaliatory conduct against Anderson which eventually led to the termination of his employment by the Board of Directors ("the Board"). IAOM filed a motion for summary judgment, which the trial court granted.

IAOM is a not-for-profit corporation and a trade association of flour millers. Anderson began his employment with IAOM on September 1, 2001, and served as its executive vice president until his employment was terminated on May 30, 2007. Doyle was a member of IAOM's Executive Committee from 2003 until May 2007, was a member of the Compensation Committee from May 2006 to May 2007, and served as IAOM's president from May 2005 to May 2006.[1]

In May or June of 2005, shortly after Doyle began his term as president, Anderson decided to voice concerns regarding the activities of IAOM's Employee Relations Committee ("the ERC"). In 2002, Anderson reviewed the minutes of ERC meetings and began to believe that the ERC was engaging in the suppression of wages in violation of antitrust laws. Anderson's report to Doyle occurred during a routine telephone conversation during which he, as the executive vice president, would discuss activities that the president would participate in throughout the upcoming year. In his deposition, Anderson stated that he made the following comments to Doyle regarding the potential antitrust violation:

> Jim, I have some serious concerns about what's taking place in [the ERC]. I believe that what they're doing in [the ERC] is illegal. I've worked with two associations that have had consent decrees with the Justice Department before. I've worked in a multi-employer bargaining association.... [W]e need to get this stopped. They're going to get the Association and themselves in serious trouble. Will you go with me to speak to either the committee or to the committee chair and see if we can get this stopped?

After Anderson expressed his concerns, Doyle did not seem upset or angry. However, Doyle changed his tone, told Anderson that the ERC needed to clean up its minutes and said that he had to go.

In December 2005 or January 2006, Anderson and Doyle had a second phone conversation during which they discussed the development of an employee handbook. During this conversation, Anderson suggested to Doyle that "what [IAOM] could really use is a sexual harassment policy that included Board members, a conflict of interest policy that included Board members and an antitrust policy." The two

---

1. Presidents served for a one-year term at IAOM. During the time periods relevant to this case, Steve Curran served as president from May 2006 to May 2007, and Keith Horton served as president from May 2007 to May 2008.

phone conversations were the only instances during which Anderson discussed any issues relating to antitrust with Doyle. Anderson never talked to anyone other than Doyle regarding his concerns about a potential antitrust violation.

Anderson alleges that after he reported the potential antitrust violation, Doyle began to engage in a pattern of retaliatory conduct that eventually led to the termination of Anderson's employment. Most of the actions Anderson identifies were related to policy changes Doyle sought to implement during his one-year term as president of IAOM. Anderson claims that through these policy changes, Doyle began micromanaging Anderson's office hours and his evaluations of his staff, and made information requests at times when Anderson was already overwhelmed with other work. Anderson asserts that Doyle drafted an employee handbook without input from Anderson. However, an e-mail from Doyle to Anderson reflects that Doyle drafted a set of employment policies but informed Anderson that they were not set in stone and that Doyle wanted his feedback on them. Anderson testified in his deposition that he did not believe Doyle really wanted his input on the policies but, rather, that the e-mail was Doyle's way of letting Anderson know that he had already made the decisions regarding employment policies. Lastly, Anderson claims that Doyle began raising an issue regarding a possible conflict of interest based on the fact that Anderson had hired Q & A Marketing, his wife's graphic design and marketing firm, to work on a quarterly publication for IAOM.

During the period of time between Anderson's report to Doyle and his termination, Keith Horton served on IAOM's Executive Committee. In his affidavit, Horton stated that during the time he served on the committee, he and other officers of IAOM began to develop concerns regarding Anderson's job performance. He was concerned that Anderson was not performing his duties on time or adequately, was not performing tasks which the committee directed him to perform, and was not keeping regular office hours. On February 12, 2007, Horton sent an e-mail to Anderson asking him to update the committee members on several issues they had concerns about. In response to Horton's inquiry regarding staff performance reviews, Anderson stated that he had not had time to complete them yet and that he objected to Board members playing any role in the staff evaluation process. As to the committee's proposed office hours for Anderson and his staff, Anderson stated that he would not ask his staff to work an additional 2.5 hours per week without extra compensation. Horton's e-mail also sought updates regarding the status of IAOM's quarterly publication and IAOM's compliance with a recent audit.

Horton found Anderson's responses to the e-mail to be evasive and became more concerned about his job performance. Therefore, he arranged to have a conference call with Anderson in which he sought clarification on several issues, such as performance reviews, office hours, the status of IAOM's publication, and compliance with an audit. As IAOM's May 2007 annual conference approached, the committee still had concerns about Anderson's job performance. Horton stated that Anderson produced inaccurate materials for the conference and that he still had not addressed a number of the issues the committee had brought to his attention in October 2006 and February 2007. Therefore, Steve Curran, the outgoing president of IAOM, called a Board meeting at which Horton, as the newly-elected president, would preside. The Board meeting took place on May 8, 2007. Several past presi-

dents, including Doyle, were in attendance so the Board could obtain a historical perspective on the ongoing issues with Anderson.

At the conclusion of the meeting, all attending Board members unanimously voted to terminate Anderson's employment.[2] The minutes of the meeting reflect that those attending discussed Anderson's failure to comply with Board directives; deficiencies in organization and printed materials at the conference; and negative feedback from IAOM members, committee members, and staff. The minutes also included a list of ten specific issues supporting the Board's decision to termination Anderson's employment:

Late (5 months), and inaccurate [Board] minutes.

Failure to address the "Conflict of Interest" with Q & A Marketing.

Failure to complete staff performance reviews and implement wage increases.

Failure to implement the Employee Handbooks.

Failure to outsource competitive Healthcare, without initiation of Jim Doyle.

Failure to send [Requests for Proposals] to specified cities for future conference location.

Failure to implement office hours as directed by the [Board], and failure to be at the office on a regular basis, Monday—Friday.

Failure to implement the Francis & Frank recommendations as directed by the [Board].

Failure to keep the International Miller publication up to date (publications were almost a full 12 months behind schedule).

Inaccurate conference materials.

The minutes included a statement that the board members felt Anderson's dereliction of duty and continuous refusal to comply with Board directives constituted sufficient grounds for termination. Handwritten notes from the meeting included a notation that "Jim Doyle feels we have adequate documentation for dismissal." Doyle also attended a meeting with several other IAOM members in which they sought legal counsel on how to proceed with the termination. However, Doyle was not a Board member and did not have a vote on the issue of whether Anderson would be discharged. Anderson was told on May 30, 2007, that his employment was being terminated.

On October 7, 2008, Anderson filed his petition alleging that he had been unlawfully discharged from his employment with IAOM in retaliation for his reports regarding possible antitrust violations. IAOM filed a motion for summary judgment, which the trial court granted. First, the court determined that Kansas substantive law applied to Anderson's claim because Kansas had the most significant relationship to the claim.[3] As to Anderson's whistleblower claim, the court found that Anderson could not establish a causal relationship between his conversations with Doyle and the termination of his employment, citing the length of time between the

---

**2.** Anderson claimed in his deposition that a meeting took place on March 15, 2007, during which IAOM's Compensation Committee agreed to terminate his employment. However, Anderson has not provided any evidence showing that this committee had the authority to discharge him; furthermore, the record indicates that the Board formally voted on the termination at the May 8, 2007 meeting and that his employment was terminated on May 30, 2007.

**3.** The record reflects that the employment relationship between Anderson and IAOM was centered in Kansas. Neither party challenges the trial court's application of Kansas substantive law to Anderson's claim.

conversations and the termination and the lack of any evidence that, at the time Anderson was discharged, anyone in IAOM other than Doyle knew of Anderson's concerns or his report to Doyle. This appeal by Anderson followed.

## Standard of Review

An appellate court's review of an appeal from summary judgment "is essentially *de novo.*" *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Whether or not summary judgment should be granted is an issue of law, and "an appellate court need not defer to the trial court's order granting summary judgment." *Id.* We review the record in the light most favorable to the party against whom summary judgment was entered. *Id.* "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record." *Id.* (citations omitted).

"Summary judgment is appropriate where the moving party establishes a right to judgment as a matter of law and that no genuine issue of material fact exists." *United Mo. Bank, N.A. v. City of Grandview*, 105 S.W.3d 890, 895 (Mo.App. W.D. 2003). The defending party in the lawsuit may establish a right to judgment as a matter of law by showing facts that negate any one of the elements of the claimant's cause of action. *Id.*

## Discussion

■ As a preliminary matter, Anderson contends in his first point on appeal that the trial court erred in requiring him to show by clear and convincing evidence that there were genuine issues of material fact because the trial court should have employed a preponderance of the evidence standard at the summary judgment stage. However, it does not appear from the language of its judgment that the trial court held Anderson to a clear and convincing evidence standard in the summary judgment proceedings; rather, the court merely stated when setting out the elements for a whistleblower claim that "in order to *prevail* on his claim for retaliatory discharge, [Anderson] must show [the elements] by clear and convincing evidence." (Emphasis added.) Furthermore, because this court's review of the trial court's judgment is *de novo*, the trial court's purported use of an incorrect standard is irrelevant, as we can employ the proper standard set out above. Therefore, Anderson's first point is denied.

In his remaining points, Anderson claims that the trial court erred in granting summary judgment in favor of IAOM because genuine issues of material fact existed as to whether: (1) his report constituted actionable whistleblowing; (2) Anderson had established causation via evidence of a pattern of retaliatory conduct by Doyle; and (3) those who terminated his employment were acting under the influence of Doyle. Because we find Anderson's third point to be dispositive, we do not address his remaining arguments.

■ Kansas follows the employment-at-will doctrine, which permits an employer to discharge an employee for good cause, no cause, or even wrongful cause. *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 42 Kan.App.2d 994, 219 P.3d 857, 861 (2009). Under Kansas law, termination of employment for whistleblowing constitutes an exception to the employment-at-will-doctrine, which allows the discharged employee to make a retaliatory discharge claim. *Id.* A plaintiff must meet

the following three elements to make a prima facie case of retaliatory discharge based on whistleblowing:

(1) a reasonably prudent person would have concluded that the employer or a coworker was engaged in activities that violated rules, regulations, or the law pertaining to public health and safety and the general welfare; (2) the employer had knowledge that the employee reported the violation prior to his or her discharge; and (3) the employee was discharged in retaliation for making the report.

*Id.* at 862.

The second element—whether the employer had knowledge of the employee's report prior to his discharge—is the element pertinent to Anderson's argument on appeal. Anderson acknowledges that the trial court granted summary judgment partially on the ground that his report was to Doyle only and that the Board, who actually discharged Anderson, had no knowledge of the report. Anderson makes no claim that the Board knew of the report. Rather, he bases his argument on the theory that Doyle influenced the Board's decision and that, therefore, his retaliatory conduct should be imputed to the Board. In making his argument, Anderson relies primarily on a Tenth Circuit case in which the court utilized such a theory in a retaliatory discharge case.[4] *See EEOC v. BCI Coca–Cola Bottling Co. of Los Angeles,* 450 F.3d 476 (10th Cir. 2006).

In *BCI,* the Tenth Circuit discussed a theory known as "subordinate bias liability," or the "cat's paw" doctrine, which "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a

dupe in a deliberate scheme to trigger a discriminatory employment action." *Id.* at 484. The Tenth Circuit found that, in order to prevail on a subordinate bias claim, a plaintiff must establish that the subordinate had more than mere influence on or input in the decisionmaking process; rather, "the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *Id.* at 487. The court added that an employer could avoid liability under this theory by conducting an independent investigation of the allegations against the employee because, in that situation, "the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated." *Id.* at 488 (noting that simply asking an employee for his version of events could defeat an inference that the decision was based on discrimination).

In applying the theory to the facts of *BCI,* the Tenth Circuit found that the decisionmaker had relied exclusively on biased information from a subordinate, made no independent inquiry into the matter, and did not ask the employee for his side of the story before discharging him. *Id.* at 491. Although the employer argued that it had conducted an independent inquiry, where the investigation involved only pulling the employee's personnel file, which contained no information regarding the incident for which he was ultimately discharged, the court found that the investigation was inadequate as a matter of law. *Id.* at 492–93.

The facts of this case are distinguishable from the circumstances in *BCI* in that Anderson has not met the causation test set out by the Tenth Circuit. Anderson

---

4. While a court applying Kansas law is not bound to follow the precedent of the Tenth Circuit, the authority may be considered persuasive. *See State v. Thompson,* 284 Kan. 763, 166 P.3d 1015, 1039 (2007).

points to several facts, arguing that they could create a reasonable inference that Doyle influenced the Board's decision. However, the Tenth Circuit test requires more than the mere influence or input of the subordinate—it requires that the subordinate's actions caused the discharge. Furthermore, the facts Anderson refers to show nothing more than influence or input from Doyle. First, Anderson alleges that the Compensation Committee, of which Doyle was a member, voted to terminate his employment on March 15, 2007. However, the facts clearly show that Anderson was not terminated until after the Board meeting where the Board members voted to terminate his employment, and Anderson alleges no facts which show that the Board's vote was somehow a result of any actions or recommendations of the Compensation Committee.

Anderson also claims that Doyle's influence on the Board's decision is demonstrated by a note in the minutes of the May 8, 2007 meeting, which stated that "Jim Doyle feels we have adequate documentation for dismissal." Although Doyle attended the meeting, he did not have a vote as to whether Anderson would be discharged, and the record indicates that he and other past presidents were in attendance at the meeting to provide a background on the ongoing issues IAOM had with Anderson. These facts, given the most generous interpretation, fail to show more than mere influence or input by Doyle, especially where the documentation supporting dismissal included information collected by other members of IAOM.

Anderson further claims that Doyle's actions caused his discharge because the reasons for the Board's decision were primarily based on Doyle's policy changes. But the Board's reasons for discharge were broader than Doyle's changes, and Doyle's policy changes themselves were not the basis for Anderson's discharge—it was the fact that Anderson simply failed to comply with many of them, for various reasons. Anderson's failure to comply with the changes was a concern for the Board. As the e-mail exchanges between Anderson and Keith Horton reveal, Anderson refused to ask his staff to work additional hours. One of the bases for his discharge was his failure to implement office hours. Anderson also stated in the e-mails that he had not completed staff performance reviews, and he objected to Board members playing a role in the staff evaluation process. One of the bases for his discharge was his failure to complete staff performance reviews. In his deposition, Anderson stated that he did not provide input on an employee handbook despite being asked to because he did not believe that Doyle truly wanted his input. Anderson's defense for his failure to implement many of Doyle's and the entire Executive Committee's policy changes was that he answered only to the Board, and he questioned whether these changes were actually directed by the Board. In his deposition, Anderson stated that if there was a doubt in his mind about what he was being told by an individual, he would "need to have a discussion with the Board about that before I could take action on it." Despite this statement, Anderson never followed up on any of the policy changes with the Board; he simply ignored them. Therefore, Anderson cannot show that Doyle's policy changes caused his discharge.

Finally, although Anderson claims he never got the opportunity to tell his side of the story, the undisputed facts indicate that Anderson was confronted about many of the issues for which he was discharged. These same facts also show that Keith Horton, who presided over the May 8, 2007 Board meeting, conducted an inquiry into the issues with Anderson. Horton testified that he was concerned about

Anderson's job performance. The February 12, 2007 e-mail from Horton to Anderson requested Anderson's status regarding staff performance reviews, office hours, IAOM's quarterly publication, health insurance information, and compliance with a recent audit. After receiving Anderson's response, Horton became even more concerned and told Anderson he wanted to set up a conference call in order to further discuss the same issues addressed by the e-mails. Horton also had concerns about the accuracy and timeliness of Anderson's Board meeting minutes and had corrected mistakes in Anderson's minutes.

The undisputed facts of the case show no more than the possibility that Doyle influenced or had input in the decision to terminate Anderson's employment. This does not meet the Tenth Circuit's test for subordinate bias liability, which requires a plaintiff to show that the subordinate's actions caused the discharge. Furthermore, the undisputed facts show that Horton, who presided over the May 8, 2007 Board meeting and had a vote in the decision to discharge Anderson, conducted an independent inquiry into the issues with Anderson and spoke directly to Anderson about many of them. Horton authored the minutes of that meeting and listed the ongoing issues with Anderson, many of which Horton addressed with Anderson. Anderson cannot establish that the decisionmakers "rel[ied] exclusively on the say-so" of Doyle. *See BCI,* 450 F.3d at 488. Therefore, where Anderson cannot take advantage of the subordinate bias liability theory recognized by the Tenth Circuit and alleges no facts which show that any member of the Board knew of his reports to Doyle, Anderson has failed to establish a genuine issue of material fact as to whether IAOM had knowledge of his report prior to his discharge. The trial court did not err in granting summary judgment in favor of IAOM.

The judgment of the trial court is affirmed.

All concur.