

# In the
# Missouri Court of Appeals
# Western District

**CHRISTINE PITCHER,**

        **Respondent,**

v.

**CENTENE CORPORATION, ET AL.,**

        **Appellants.**

**WD82564**

**OPINION FILED:**

**MARCH 3, 2020**

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Jack Richard Grate, Judge**

**Before Division One: Thomas N. Chapman, Presiding Judge, Mark D. Pfeiffer, Judge,**
**Anthony Rex Gabbert, Judge**

Centene Corporation ("Centene") and AcariaHealth Pharmacy, Inc. ("Acaria") ("Appellants" collectively) appeal the circuit court's judgment entered on a jury verdict finding in favor of Christine Pitcher on her common-law retaliatory discharge claim against Appellants. Appellants assert eight points on appeal, contending that the circuit court, 1) erred in overruling Acaria's motion to dismiss, arguing the trial court had no jurisdiction over Acaria; 2) erred in overruling Centene's motion for judgment notwithstanding the verdict, arguing Centene was not Pitcher's employer; 3) erred in overruling Appellants' motion for judgment notwithstanding the verdict, arguing Pitcher failed to make a submissible claim of retaliatory discharge; 4) erred in

admitting evidence of a separation agreement offered Pitcher; 5) erred in excluding evidence of an ADT report; 6) erred in awarding front pay, arguing Pitcher did not plead a request for front pay; 7) erred in awarding front pay, arguing front pay was inappropriate under the circumstances, and; 8) erred in awarding front pay to retirement age. We affirm.

**Factual and Procedural Background**

Pitcher, a licensed pharmacist and Missouri resident, was hired in May 2014 by Acaria as the director of a pharmacy located in Lenexa, Kansas (also called "PC20"). Acaria is a corporation incorporated in California with corporate headquarters in Orlando, Florida. Centene is Acaria's parent company. Centene is a Delaware corporation with its principal place of business in St. Louis, Missouri.

In July 2016, Pitcher raised concerns about the legality of a transaction involving a Kansas Medicaid recipient. A Kansas Medicaid beneficiary who had an HIV infection and was immunocompromised required refill of an anti-parasitic medication called Daraprim. The cost of a one-month supply of Daraprim is $54,000. Pitcher sent an email to Acaria's Houston, Texas pharmacy (also called "PC11") requesting a transfer of Daraprim to the Lenexa Pharmacy. In response, she received an email from Adnan Raza, an intern specialist, stating: "We're not supposed to transfer Daraprim. Daraprim is to be filled only at PC11. Please send it back once you receive immediately."

On July 22, 2016, Alexis Baez, an account executive with Acaria, sent an email to Maurice Bundage, the inventory manager in Houston, with a copy to a number of other coworkers, reading: "… Sunflower must be shipped out of PC20. Right now we have an order that a patient needs tomorrow, and that the health plan is concerned with the implications if we process the claim out

2

of PC11, considering that PC20 should be the only pharmacy processing for Sunflower[1] patients …."

Jonalan Smith, Vice-President of Sunflower's Pharmacy Division and liaison with the Kansas Medical Assistance Program (KMAP), emailed to Baez and others, including Pitcher: "… the Houston pharmacy should never fill for Kansas members. Only the Lenexa pharmacy should fill for Kansas members." Later that day, Jason Ng wrote to Pitcher's supervisor, Steve Cobb: "Steve, due to billing issues can do a virtual transfer for Daraprim, No. 28 for PC20. We did not transfer meds earlier per Adnan. Only PC11 can fill Daraprim orders. Please let us know."

A "virtual transfer" occurs when a pharmacy provides a service at one location, and bills for that service as if it was provided at a different location. Based on the above email exchange, Pitcher became concerned that the virtual transfer involving shipping Daraprim from the Houston pharmacy to the patient, but billing for it as if it was shipped from Kansas, was prohibited by Kansas regulations on Medicaid reimbursements as fraudulent and could result in her losing her license.

That same day, Cobb emailed to approve the virtual transfer. In response, Pitcher emailed Cobb and others:

> I apologize for the inconvenience that this may cause but because Sunflower stated that this could not be shipped from another location, I ethically bond [sic] and unable to complete this transfer. Please complete this transfer by those who did receive the authorization from Sunflower to perform the virtual transfer. The correspondence that I am included on did not authorize this from Sunflower. If there is authorization that I missed, please forward this and I am more than happy to complete the transfer.

---

[1] Sunflower health plan, also a subsidiary of Centene, handles Kansas Medicaid reimbursements.

On July 26, 2016, Bundage emailed: "Transfer has been created. PC 20 please received into your stock." That same day, Pitcher forwarded the email string related to Daraprim to John Vandervoot, Centene's Compliance Officer, with this accompanying explanation, testifying at trial that she sent the email because she was feeling harassed for doing the right thing:

> … There was a shipment made from Houston on Friday for a Kansas Medicaid patient. I realize that Kansas law typically does not allow for Medicaid to be shipped from out of state which is confirmed by Jonalan.

> Ethically, I believe that I need to be within Kansas law and have this medication be shipped from Houston PC11. I do not know the politics surrounding the transfer of this medication to PC20 in Kansas but honestly I am reluctant to sign for a transfer that Sunflower did not approve or provide an exception for.

Pitcher received no response from Vandervoot.

> That same day, Pitcher emailed Baez, Cobb, and others:

> … Unfortunately, the VP of Sunflower stated that all shipments should come out of Lenexa. Until Compliance/legal weighs in on this, we are unable to complete this transfer since it is not in compliance with Kansas Law. Additionally, if Jonalan would authorize this exception, then there is no problem.

After Pitcher raised concerns about the legality of the virtual transfer of Daraprim, Appellants engaged in a pattern of conduct Pitcher believed was retaliatory for Pitcher having raised concerns. Although Cobb had reviewed Pitcher's performance on July 25, 2016, indicating Pitcher's performance exceeded expectations, on August 18, 2016, Cobb issued a "Last Chance Agreement" to Pitcher stating that her conduct was unprofessional and unacceptable. Prior to this agreement, Pitcher had received no verbal or written discipline or counseling.

On November 29, 2016, Mr. Jackson emailed Richard Giles, with a copy to Cobb and Kenyata Virgil, "… We will be officially terminating Christine Pitcher's employment on Thursday morning November 30 …. Her manager, Steven Cobb and HR Manager Kenyata Virgil, will communicate this decision via phone while Christine is at her home location …." On December

4

1, 2016, Cobb and Virgil called Pitcher at her home in Missouri to terminate Pitcher's employment. The claimed reason for Pitcher's termination was that she had left the pharmacy unattended on November 18, 2016; Pitcher testified that she never left the pharmacy unattended and never admitted to leaving the pharmacy unattended. Contemporaneous with Pitcher's termination, Appellants offered Pitcher a Separation Agreement.

On May 3, 2017, Pitcher filed a common law retaliatory discharge claim against Appellants in Jackson County, Missouri. The claim was tried to a jury on October 1-4, 2018, in a bifurcated trial. On October 4, 2018, the jury returned a verdict in Pitcher's favor, awarding her $80,012 in compensatory and $750,000 in punitive damages against each appellant. On November 2, 2018 the court held an evidentiary hearing on whether Pitcher was entitled to the equitable relief of front pay. On November 27, 2018, the court entered its judgment on the jury's verdict and also awarded $525, 449.60 (with interest accruing at 7.20%) to Pitcher "for an Award of Front Pay."[2] Appellants filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial, and a motion for remittitur or to amend the judgment. The trial court denied the motions on February 11, 2019. This appeal follows.

---

[2] "Front pay is an equitable remedy, an offshoot of the court's equitable power to grant reinstatement and otherwise make whole a victim of discrimination." *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 524 (Mo. banc 2009). "The term 'front pay' describes a lump sum representing the discounted present value of the difference between the earnings an employee would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." *Id.* at 520 n.3. (Internal citations and quotation marks omitted). "Back pay is calculated based upon the difference between the value of the compensation the plaintiff would have been entitled to had he remained employed by the defendant and whatever wages he earned during the relevant period. Generally, the 'relevant period' runs from the date of termination until the date of reinstatement or judgment." *Clark v. Matthews Intern. Corp.*, 639 F.3d 391, 396 (8th Cir. 2011) (Internal quotation marks and citations omitted).

## Standard of Review

Our standard of review is set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Schollmeyer v. Schollmeyer*, 393 S.W.3d 120, 122 (Mo. App. 2013). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* at 122-123.

## Point I – Personal Jurisdiction

In Appellants' first point on appeal, Appellants contend the circuit court erred in overruling Acaria's motion to dismiss, arguing the trial court does not have personal jurisdiction over Acaria because Acaria did not commit a tort in Missouri and Acaria does not have sufficient minimum contacts with Missouri to establish specific personal jurisdiction. Acaria argues that the fact that Acaria contacted Pitcher at her Missouri residence to advise her she was fired was insufficient to establish personal jurisdiction under Missouri's long-arm statute.

"[W]hen the issue is whether Missouri courts have personal jurisdiction over a defendant, a reviewing court defers to the fact-finding court with regard to any facts that are essential to that determination[.]" *Pearson v. Koster*, 367 S.W.3d 36, 44 (Mo. banc 2012). "[H]owever, the ultimate question of whether the exercise of jurisdiction meets the standards of the Missouri long-arm statute and the constitution remains a legal question, which is reviewed independently on appeal." *Id.* "A plaintiff has the burden to establish that a defendant's contacts with the forum state were sufficient." *Andra v. Left Gate Property Holding, Inc.*, 453 S.W.3d 216, 224 (Mo. banc 2015) (internal quotation marks and citations omitted). "[T]he sufficiency of the evidence to make a prima facie showing that the trial court may exercise personal jurisdiction is a question of law[.]" *Id.* at 225 (internal quotation marks and citations omitted). Review of the evidence requires consideration of the quality and nature of the activity based on the facts of the particular case. *Id.*

"Missouri courts employ a two-prong test to evaluate personal jurisdiction over nonresident defendants. First, the defendant's conduct must fall within Missouri's long-arm statute, section 506.500. Second, the defendant must have sufficient minimum contacts with Missouri to satisfy due process." *Id.*

Section 506.500 - Tortious Act

Section 506.500, RSMo 2016, states in relevant part:

1.     Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this state;

(2) The making of any contract within this state;

(3) The commission of a tortious act within this state;

…. "Section 506.500 is construed to extend the jurisdiction of the courts of this state over nonresident defendants to that extent permissible under the Due Process clause." *Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 232 (Mo. banc 2010) (internal quotation marks and citations omitted).

Pitcher contends Acaria finalized its tortious act of retaliatory discharge by discharging her in the State of Missouri. Acaria contends that communication of a termination is not an element of retaliatory discharge, citing *Goodman v. Wesley Med. Ctr., L.L.C.*, 78 P.3d 817, 821 (Kan. 2003). *Goodman* states:

To establish a retaliatory discharge claim for whistleblowing, a plaintiff has the burden of proving the following elements by clear and convincing evidence: A reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had

7

knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. In addition, the employee must prove that any whistleblowing was done in good faith based on a concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain.

*Id.* (internal quotation marks and citations omitted).

We find that, while communication of termination is not an element of retaliatory discharge, the employee's discharge is required to establish a claim. As relevant here, "discharge" is defined in Webster's Third New International Dictionary as: "To dismiss from employment: terminate the employment of." Here, Acaria internally made the decision to formally communicate Pitcher's discharge from her employment while Pitcher was home in Missouri. While Acaria argues that the decision to terminate Pitcher was made in Florida, the tort did not accrue until it became reasonably ascertainable to Pitcher that she had been injured. Pursuant to K.S.A. 1996 Supp. 60-513, an action for injury to the rights of another "shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then … [when] the fact of injury becomes reasonably ascertainable to the injured party[.]" In *Johnston v. Farmers Alliance Mut. Ins. Co.*, 545 P.2d 312, 316 (Kan. 1976), the Kansas Supreme Court held that, although a plaintiff drew a pay check for several months after termination, the cause of action for retaliatory discharge accrued "upon receipt of official notice of termination" because it was on that date that damages for mental suffering and damage to reputation were caused; further, "[a]ny punitive or exemplary damages would have accrued upon notice of termination[.]" The *Johnston* Court quoted *Yeager v. National Cooperative Refinery Ass'n*, 470 P.2d 797 (Kan. 1970): "'In general, a cause of action accrues … as soon as the right to maintain a legal action arises, the true test being at what point in time the plaintiff could first have filed and prosecuted his action to a successful conclusion.'" *Id.*

8

Our Missouri Supreme Court stated in *Bryant* that extraterritorial acts that produce consequences in Missouri are subsumed under the tortious act section of Section 506.500. 310 S.W.3d at 232. "For the statute to apply, the tortious act may occur outside of Missouri, so long as it produces actionable consequences in Missouri. *Noble v. Shawnee Gun Shop, Inc.*, 316 S.W.3d 364, 371 (Mo. App. 2010) (internal quotation marks and citations omitted). "Some courts have required the Missouri consequences to have been 'intentionally directed' toward Missouri,…, while others have not[.]" *Id.* Here, viewing the facts in the light most favorable to the trial court's ruling, Acaria chose to discharge Pitcher at her Missouri home, and it can be inferred from the evidence that the emotional distress Pitcher alleges resulted from that discharge occurred in Missouri as well.

Acaria argues Pitcher's mere presence in Missouri at discharge was insufficient to establish personal jurisdiction and relies on *State ex rel. PPG Industries, Inc. v. McShane*, 560 S.W.3d 888, 892-893 (Mo. banc 2018). Acaria argues that, in *McShane*, although the out-of-state manufacturer made representations on its website that were received by the plaintiff in Missouri, relied upon in Missouri, and caused injury in Missouri, the Court found the defendants had no meaningful presence in Missouri and Plaintiff's mere presence was insufficient to establish jurisdiction. *Id.* Acaria ignores that, in *McShane*, the Court distinguished *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 232 (Mo. banc 2010), a case finding personal jurisdiction where physical mail, emails, and telephone calls were made directly to the Missouri plaintiff, concluding that, "[h]ere, no such direct or individual communication was made to [Plaintiff]." *McShane*, 560

9

S.W.3d at 892. In this case, direct communication was made by Acaria to Pitcher in Missouri when she was discharged from employment.[3]

Minimum Contacts

> The Due Process Clause of the Fourteenth Amendment prohibits courts 'from exercising personal jurisdiction over a defendant where to do so offends 'traditional notions of fair play and substantial justice.' In the absence of one of the traditional territorial bases of personal jurisdiction – presence, domicile or consent – a court may assert personal jurisdiction over a defendant only if certain minimum contacts between Missouri and the defendant are established.
>
> When evaluating minimum contacts, the focus is on whether there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. This focus gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit. Further, the requirement that a defendant purposefully avail itself of the privilege of conducting activities within a forum state ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.

*Good World Deals, LLC. V. Gallagher*, 554 S.W.3d 905, 912-913 (Mo. App. 2018) (internal quotation marks and citations omitted).

---

[3] Acaria cites additional inapposite cases, inapposite because they regard the making of a contract or transaction of business within the State, not the tortious conduct portion of Missouri's long-arm statute. In *Poor Boy Tree Service, Inc. v. Dixie Elec. Membership Corp.*, 390 S.W.3d 930 (Mo. App. 2013), the Missouri plaintiff contacted the out-of-state defendant and asked the defendant to telephone the plaintiff in Missouri to accept the plaintiff's offer to provide emergency cleanup services in the state of Louisiana. *Id.* at 931. The defendant did so, and the Missouri plaintiff later attempted to sue the defendant in Missouri. *Id.* The Southern District concluded that the telephone call into Missouri did not create a contract because "[s]uch a contract is made in the state where the acceptor speaks into the phone." *Id.* The court further concluded that "one phone call is not 'transacting business' for long-arm purposes." *Id.* at 931-932.

*Hollingsworth v. Acumen I.T., LLC*, No. 4:14CV1492SNLJ, 2014 WL 7003807 (E.D. Mo. Dec. 10, 2014), is an **unpublished** decision relied on by Acaria regarding a citizen of Missouri who worked in South Carolina and was terminated from employment in South Carolina. The employee contended personal jurisdiction over the defendant employer was proper in Missouri because the defendant engaged in telephone calls and email transmissions with plaintiff regarding negotiation of the employment. *Id.* at *2. The plaintiff claimed the South Carolina company had contracted and transacted business within Missouri; the court rejected both arguments. *Id.* at *2-*3.

Aside from Acaria purposefully contacting Pitcher in Missouri to discharge her, the evidence showed that Acaria employed at least three people within Missouri. In the course of Pitcher's employment, she was involved in selling products on behalf of Acaria in Missouri by visiting doctors' offices and meeting with providers in Missouri. Pitcher's W-2 form and her paystub indicate St. Louis, Missouri as Acaria's business address. The Separation Agreement offered Pitcher by Appellants provides that the "Agreement shall be construed and enforced in accordance with the laws of the State of Missouri." Acaria is wholly owned by Centene Corporation, a Missouri corporation, which dictates Acaria's policies and procedures. Given these facts, we find Acaria purposefully availed itself of the privilege of conducting activities within Missouri so as to establish minimum contacts within the State to satisfy due process.

We conclude that the trial court did not err in overruling Acaria's motion to dismiss for lack of jurisdiction as sufficient evidence in the record supports that the retaliatory discharge cause of action arose out of Missouri, and Acaria purposefully availed itself of the privilege of conducting activities within Missouri so as to establish minimum contacts within the State to satisfy due process.

Point I is denied.

**Point II – Centene as Employer**

In Appellants' second point on appeal, Appellants contend the trial court erred in overruling Centene's motion for judgment notwithstanding the verdict wherein Centene argued Centene was not Pitcher's employer and, therefore, could not be liable for retaliatory discharge of Pitcher. Under Kansas law only an employer may be liable for an employee's claim of retaliatory discharge.

11

*Rebarchek v. Farmers Co-op. Elevator*, 35 P.3d 892, 904 (Kan. 2001).[4] "[A] plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are joint employers. The joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment." *Bristol v. Board of County Com'rs of County of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002). If so, they are considered joint employers. *Id.*

> Under the joint employer test, two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment. Both entities are employers if they both exercise significant control over the same employees. An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer[.]

> Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances[.] Additional factors courts consider for determining control under the joint employer test include the ability to promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; … day to day supervision of employees, including employee discipline; and control of employee records, including payroll, insurance, taxes and the like.

*Knitter v. Corvia Military Living*, LLC, 758 F.3d 1214, 1226 (10th Cir. 2014) (internal quotation marks and citations omitted).

"To survive either a motion for directed verdict or a motion for judgment notwithstanding the verdict, the plaintiff must have made a submissible case." *Wagner v. Bondex Int'l, Inc.*, 368

---

[4] While the parties dispute Missouri's long arm jurisdiction to hear Pitcher's claims, there is no dispute that Kansas law applied to Pitcher's claim that she was retaliated against in contravention of Kansas law. Pitcher had raised concerns that she and the pharmacy she managed in Kansas were being instructed to violate Kansas law. She was thereafter retaliated against (terminated) for making that report. Under Kansas law, "termination of an employee in retaliation for the good-faith reporting of a serious infraction of rules, regulations, or the law pertaining to health and safety or the general welfare by a coworker or an employer to either company management or law enforcement officials is an actionable tort." *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d 857, 861-62 (Kan. App. 2009).

S.W.3d 340, 348 (Mo. App. 2012) (internal quotation marks and citations omitted). To determine whether a plaintiff has presented a submissible case "by offering evidence to support every element necessary for liability," the evidence is viewed "in the light most favorable to the jury's verdict, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Moody v. Kansas City Bd. of Police Comm'rs*, 539 S.W.3d 784, 791 (Mo. App. 2017) (citation omitted). "Whether the plaintiff made a submissible case is a question of law subject to *de novo* review." *Wagner*, 368 S.W.3d at 348 (internal quotation marks and citations omitted). We reverse for insufficient evidence, "only where there is a complete absence of probative fact to support the jury's conclusion." *Moody*, 539 S.W.3d at 791.

Centene contends the evidence showed that Centene is a holding company with no employees and Pitcher was never employed by Centene. Centene argues that every witness testified at trial that they were either employed by Acaria, Centene Management Company, Centene National Company, or Sunflower, with no one testifying they were employed by Centene Corporation. Centene argues that the power to hire and fire employees is possessed only by an employer and Kansas has not extended the tort of retaliatory discharge to an entity that does not have the power to terminate. Centene argues that, even assuming Centene had the power to terminate, because Kansas has not explicitly extended liability for retaliatory discharge to a non-decision maker, and there was no evidence here that Centene took any part in Pitcher's termination, Centene cannot be considered Pitcher's employer under Kansas law. In its reply brief, Centene focuses on the fact that there was no evidence that Centene terminated Pitcher, arguing that Centene taking a role in terminating Pitcher would be necessary to extend liability.

Pitcher argues Centene was her "joint employer." A "Policy and Procedure" document issued by Centene (Exhibit 46) regarding "Separation from Employment" states: "This policy

13

applies to all employees of Centene, its affiliates, health plans and subsidiary companies (collectively the 'Company')." The document discusses that employees involuntarily terminated may be eligible for severance pay. It also states that, "All involuntary terminations must have the *prior* approval of Corporate Human Resources [.]" (Emphases original). Karuna Rao testified as Acaria's "general counsel" and legal officer; she also testified as Centene's "corporate representative." Rao testified that she was not sure if Corporate Human Resources were "exclusively" in St. Louis, suggesting that Centene, with its principal place of business in St. Louis, houses some form of corporate human resources that takes part in terminations.

Rao testified that the "Policy and Procedure" document regarding "Speaking up: Reporting concerns, policy violations, misconduct and non-compliance" (Exhibit 14) applied to Acaria employees. The document collectively references the "Corporation" as "employees, directors, and officers of Centene Corporation, its applicable affiliates and Health Plans." The policy states that employees must report concerns even if they only suspect a policy violation, misconduct, or instance of non-compliance. An employee with knowledge of a policy violation or misconduct who fails to report may be subject to disciplinary action, including termination. The policy states that "corporation employees" should also self-report personal involvement in violations, misconduct, or non-compliance, with "Centene" ultimately considering the situation and whether disciplinary action is necessary. The policy states that when an employee raises a concern, "Centene Corporation" will investigate. If an employee does not believe he or she can report the issue to an immediate supervisor, the policy lists several individuals who may be contacted including the Corporate Compliance Officer, Centene Corporation's Senior Leadership, Centene Corporation's CEO, and Centene Corporation's Board of Directors Audit Committee. Rao testified that, "[i]t doesn't always go up to the corporate level, it can stay at the subsidiary level."

14

Although at trial Rao testified that Centene Corporation is a holding company with no employees, she acknowledged that Centene Corporation has an "Employee Handbook," utilized by Acaria. The handbook was entered into evidence. The handbook applies to "all Centene employees" and provides that the Company "shall not enter into any contract of employment without the prior approval of the Board of Directors or the Chairman & CEO of Centene Corporation." The handbook references a Company Policies & Procedures internet site, with one of the stated purposes of the internet site being to "Obtain and share information between the subsidiary businesses and corporate." The handbook draws distinctions between Centene Corporation and its subsidiary health plans and businesses advising that, "personnel files, which include information relevant to employment of all employees of Centene and its subsidiary health plans and businesses, are maintained and housed at the corporate office in the Human Resources Department." The handbook provides that, while employed by Centene, and any time thereafter, an employee shall not disclose confidential matters relating to Centene or any of its activities. It further provides that the "written approval of an authorized officer of Centene Corporation shall be obtained prior to the release of such information." Unauthorized release could result in disciplinary action, including termination of employment.

Pitcher's July 25, 2016, "Performance Review" includes various categories of Pitcher's "Competencies" assessed by Steve Cobb including decision making, domain expertise, partnership approach, personal conduct, process improvement, production results, leadership, etc. This Performance Review appears to have pre-printed expectations in each category. Under the "Partnership Approach" category, part of the pre-printed expectation states, "Always pursues solutions that are in the best interest of Centene, not a particular person, group, or function." Under

15

the "Personal Conduct" category, part of the pre-printed expectation states, "Embraces Centene values. Demonstrates absolute integrity and pride in what Centene does."

Contemporaneous with Pitcher's termination, Appellants offered Pitcher a "Separation Agreement and General Release," entered into evidence as Exhibit 11, which states:

> This Separation Agreement and General Release ("Agreement") is made and effective as of the 1st day of December, 2016 by and between Centene Corporation and its parents, subsidiaries, affiliates, officers, directors, employees and agents, including but not limited to Envolve Pharmacy Solutions, Acaria Health and US Script (hereinafter both collectively and individually referred to as "Employer") and Christine Pitcher ("Employee").

With regard to "Separation Benefits," the Separation Agreement states that "Employee's employment with Employer terminates effective the 1st day of December 2016."

We find that the evidence presented at trial was sufficient to support that Centene was an employer of Pitcher. The evidence showed that, although Rao testified Centene had no employees, Centene referenced itself in its own publications as an employer with employees. The evidence showed that Centene maintained the personnel files of subsidiary businesses at its corporate headquarters, and had the ability to terminate employees, including employees of subsidiary businesses. Pitcher was evaluated by and obligated to perform under Centene's standards, being required to always pursue Centene's best interest. The factual issue of whether Centene was Pitcher's employer was presented to the jury as a necessary determination before any liability could be found; the jury concluded that Centene was Pitcher's employer. We conclude the circuit court did not err in overruling Centene's Motion for Judgment Notwithstanding the Verdict on Centene's claim that Pitcher did not present any evidence Centene was her employer or "joint employer," as Pitcher presented evidence supporting the jury's determination.

Appellants' second point on appeal is denied.

16

**Point III – Submissible Claim for Retaliatory Discharge**

In Appellants' third point on appeal, Appellants contend the circuit court erred in overruling their motion for judgment notwithstanding the verdict on the grounds that Pitcher failed to make a submissible claim of retaliatory discharge. Appellants claim Pitcher failed to present substantial evidence establishing the following three elements of her claim: (1) a reasonably prudent person would have concluded Appellants violated the subject regulation, (2) Appellants had knowledge of Pitcher reporting such regulation violation prior to her discharge, and (3) Pitcher was actually discharged in retaliation for making the report.

> Rule 72.01 states that, '[a] motion for directed verdict shall state the specific grounds therefore.'
>
> To preserve a question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion for a new trial or to set aside a verdict must assign as error the trial court's failure to have directed such a verdict.... [However], a motion for directed verdict that does not comply with the requirements of Rule 72.01(a) neither presents a basis for relief in the trial court nor preserves the issue in the appellate court. ….
>
> Where an insufficient motion for directed verdict has been made, a subsequent post-verdict motion is without basis and preserves nothing for review.

*Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011) (internal quotation marks and citation omitted). Here, we will only address the issues raised herein that were preserved below.

In their motion for directed verdict at the close of evidence, Appellants argued that a reasonably prudent person could not conclude from the evidence that Defendants violated K.A.R. § 30-5-70(c). Appellants contended that, "Plaintiff presented no evidence that Defendants violated the regulation. It therefore follows, that there is no evidence to support that a reasonably prudent person could believe Defendants could have violated the regulation at issue." Appellants further

17

argued that Centene had no involvement in Pitcher's termination and, therefore, Pitcher could not establish Centene terminated her for making a report. Finally, Appellants argued the evidence did not support that Pitcher was terminated because of any report she made, arguing Pitcher testified she was terminated for leaving the pharmacy unattended.[5]

Reasonably Prudent Person

Pitcher's petition alleged that "K.A.R. 30-5-70(c)(2) sets forth the lawful limitations on reimbursement for services for Kansas Medicaid beneficiaries outside of 50 miles from the Kansas border." Pitcher further alleged that "[a] reasonably prudent person would have concluded that directing Plaintiff to submit the services through the Lenexa, Kansas facility at which she worked so as to be reimbursed violated K.A.R. 30-5-70(c)(2)."

K.A.R. § 30-5-70(c) states, in part:

(2) Payment for out-of-state services shall be limited to the following:

(A) Payment on behalf of recipients if medical services are normally provided by medical vendors that are located in the bordering state and within 50 miles of the state border, except for community mental health center services, alcohol and drug abuse services, or partial hospitalization services;

(B) emergency services rendered outside the state;

(C) nonemergency services for which prior approval by the agency has been given. Authorization from the agency shall be obtained before making arrangements for the individual to obtain the out-of-state services;

(D) services provided by independent laboratories; …

"Kansas courts permit the common-law tort of retaliatory discharge as a limited exception to the at-will employment doctrine when it is necessary to protect a strongly held state public

---

[5] Appellants did not preserve for review their claim on appeal that Pitcher failed to make a submissible case on the element that they had knowledge of Pitcher's complaint prior to her discharge.

policy from being undermined." *Campbell v. Husky Hogs L.L.C.*, 255 P.3d 1, 5 (Kan. 2011).  Under Kansas law, "termination of an employee in retaliation for the good-faith reporting of a serious infraction of rules, regulations, or the law pertaining to public health and safety and the general welfare by a coworker or an employer to either company management or law enforcement officials is an actionable tort."  *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 219 P.3d at 861-62.

As stated above, to prevail on a claim of retaliatory discharge for whistleblowing, a plaintiff must prove by clear and convincing evidence that, 1) a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare, 2) the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee, 3) the employee was discharged in retaliation for making the report, and 4) any whistleblowing was done in good faith based on a concern regarding the wrongful activity reported rather than for a corrupt motive like malice, spite, jealousy, or personal gain.  *Goodman*, 78 P.3d at 821.

On July 20, 2016, Pitcher emailed Adnan Raza at Acaria's Houston, Texas pharmacy requesting a transfer of Daraprim and was told, "We are not supposed to transfer Daraprim. Daraprim is to be only filled at PC11."  Acaria was aware that medications through the Sunflower Health Plan were required to be shipped out of the Lenexa Pharmacy.  On Friday, July 22, Baez, an account manager with Acaria, spoke via email to several people with Sunflower Health Plan asking for an "override" to allow the Daraprim to be dispensed out of Texas.  Baez was told that an override could not be performed without a reason as "[t]his would hit our State encounters and that's something we would not want at $54,000 a month."  Baez sent internal emails requesting information to determine if the Houston pharmacy could ship the medication and "do a virtual transfer in order to have PC 20 process the claim[.]"  Jason Ng emailed Steve Cobb, "Due to billing

19

issues, can do a virtual transfer for Daraprim #28 for PC20. We did not transfer meds earlier per Adnan only PC11 call fill Daraprim orders. Please let us know, thanks." Baez informed Sunflower Health Plan that the Lenexa pharmacy was processing the claim for Daraprim "so there is no risk when it comes to the State encounter reconciliation" and that Acaria's Houston pharmacy "is duly licensed with KS Medicaid and has been dispensing for Sunflower members." In response, Baez received an email from Jonalan Smith, Vice-President of Sunflower's Pharmacy Division and liaison for Kansas Medicaid, stating, "Alexis-the Houston pharmacy should never fill for KS members. Only the Lenexa pharmacy should fill for Kansas members." On that same date Steve Cobb, Pitcher's boss, approved the virtual transfer.

On Monday, July 25, 2016, at 8:25 a.m., Pitcher was copied on an email sent by Raza to Maurice Bundage, inventory manager for the Houston pharmacy, stating that the transfer and order had not been completed in Scriptmed, and to "please create a transfer PO for 28 Daraprim," also advising PC20 that, "once PO is created please receive it, and complete the order out of Scriptmed." At 11:31 a.m. Bundage sent an email stating, "Transfer has been created. PC 20 please receive into your stock."

At 11:39 a.m., Pitcher (head pharmacist of PC20) sent an email to Cobb indicating that, because Sunflower stated the Daraprim could not be shipped from another location, Pitcher was ethically unable to complete the transfer asking, "Please complete this transfer by those who did receive authorization from Sunflower to perform the virtual transfer. The correspondence that I am included on did not authorize this from Sunflower. If there is authorization that I missed, please forward this and I am more than happy to complete the transfer." The record does not show that Cobb responded. At 2:21 p.m., Raza emailed PC20 to "Please receive this transfer and complete the order by EOB today." At 2:45 p.m., Pitcher forwarded the email correspondence regarding

this issue to John Vandervoot, Acaria's Compliance Officer, stating, "Ethically, I believe that I need to be within Kansas law and have this medication be shipped from Houston PC11" and advising that she was reluctant to sign for a transfer Sunflower did not approve or provide an exception for. She requested that Vandervoot, "Please advise or weigh on this concern." Vandervoot never responded.

On Tuesday, July 26, 2016, at 10:22 a.m., Timothy Do sent an email asking, "Are we still proceeding with a Virtual Transfer?" At 10:29 a.m. Jason Ng responded that the medication was shipped Saturday and advised Pitcher to "Please complete out of SM after you accepted the transfer." Pitcher's boss, Cobb, was copied on this correspondence as were numerous other individuals. At 11:46 a.m. Pitcher sent an email to the individuals involved in the virtual transfer, including Vandervoot, stating, "Unfortunately, the VP of Sunflower stated that all shipments should come out of Lenexa. Until Compliance/legal weighs in on this, we are unable to complete this transfer since it is not in compliance with Kansas law."

At trial Pitcher testified she was being asked to sign for a virtual transfer because the medication had already been shipped directly to the patient. According to Pitcher, the virtual transfer would make it appear the services were provided in the state of Kansas so that the claim could be paid through Kansas Medicaid. Cobb, a registered pharmacist, testified at trial that his understanding of a virtual transfer was consistent with Pitcher's testimony. Cobb was asked at trial if he understood Pitcher to be refusing or objecting to doing a virtual transfer because of an issue with regard to compliance with Kansas law. He responded that he "understood her point," agreed that it "was a reasonable point on her behalf," and responded, "Possibly, yes" to whether a reasonably prudent person could conclude that the request to do a virtual transfer may violate

21

Kansas law. Cobb also testified that he could see how Pitcher could have considered the request to conduct the virtual transfer to be in violation of law.

We conclude that Pitcher presented substantial evidence establishing that a reasonably prudent person would have concluded Appellants violated or were in the process of violating the subject regulation, as Pitcher made her concerns of a legal violation well-known in her email correspondence, none of which were contradicted or disputed at the time, and Pitcher's boss testified that a reasonably prudent person would conclude the same. We disagree with Appellants' claim that Kansas law requires Pitcher show that Appellants actually violated the law in order for Pitcher's concerns to have been reasonable. Pitcher was only required to show that a reasonably prudent person would have concluded the employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare.[6]

Centene's Involvement in Termination

We also find Pitcher presented substantial evidence that Centene took part in Pitcher's termination. Pitcher was involuntarily terminated. A "Policy and Procedure" document issued by

---

[6] An **unpublished** Kansas appellate decision **relied on by Appellants**, *Thompson v. Topeka Convention & Visitors Bureau, Inc.*, No. 94142, 2006 WL 686471 *6 (Kan. App. Mar. 17, 2006), states the same. In *Thompson*, however, the court concludes that, because the entity alleged to have violated the law was not the plaintiff's employer, the plaintiff failed to meet a crucial element of the tort of whistle-blowing. *Id.* at *7. Here, Pitcher proved the "employer" element of her claim.

Additional cases cited by Appellants in support of their position are equally distinguishable. In *Fowler v. Criticare Home Health Services, Inc.* the plaintiff alleged that he was retaliated against for whistle-blowing under *Palmer v. Brown*, 752 P.2d 685 (Kan. 1988), and also retaliated against for refusing to violate a federal criminal statute. 10 P.3d 8, 12 (Kan. App. 2000). The *Fowler* court separated its discussion of "Retaliatory Discharge for Whistle-Blowing" from its discussion of "Retaliatory Discharge for Refusal to Break the Law." *Id.* at 14-16. The *Fowler* court reinforced *Palmer's* continued applicability as the standard for Kansas common law retaliatory discharge claims, and there is no dispute that *Palmer* is applicable to Pitcher's claim. *Id.* at 14-15. Here, Pitcher made internal reports to company management and legal personnel advising of her concerns and also seeking advice. Both management and legal were silent regarding these concerns, and in the midst of Pitcher's reports, Pitcher was being instructed to complete a task that even her boss testified would make a reasonably prudent person believe was a violation of Kansas law.

Centene (Exhibit 46) regarding "Separation from Employment" states: "This policy applies to all employees of Centene, its affiliates, health plans and subsidiary companies (collectively the 'Company')." The document discusses that employees involuntarily terminated may be eligible for severance pay. It also states that, "All involuntary terminations must have the *prior* approval of Corporate Human Resources [.]" (Emphases original). The Separation Agreement offered Pitcher states that it is "between Centene Corporation and its parents, subsidiaries, affiliates, officers, directors, employees and agents, including but not limited to Envolve Pharmacy Solutions, Acaria Health and US Script (hereinafter both collectively and individually referred to as "Employer") and Christine Pitcher ("Employee")." The content of the Separation Agreement which names Centene an "Employer" of Pitcher is consistent with the Policy and Procedure document stating that Centene's Corporate Human Resources must give prior approval of an involuntary termination. The Agreement provides that, upon signing, Pitcher could not sue Centene for any claims Pitcher might have against Centene, that Pitcher would not disparage Centene or anyone associated with Centene, and the Agreement would be enforced under the laws of Centene's home state, Missouri. If signed, Pitcher was to deliver a signed copy to "Centene." Nowhere in the document is "Centene" used to reference any entity but Centene Corporation. The evidence also showed that Centene Corporation in St. Louis is where Acaria's security video feeds are transmitted, and these video feeds were requested by Acaria's management in reviewing whether Pitcher left her pharmacy unsecured.

We find that Pitcher presented substantial evidence from which a reasonable juror could conclude that Centene was involved in and exercised control over Pitcher's termination.

23

Evidence Supporting Pitcher Terminated for Report of Concerns

With regard to Appellants' argument that the evidence did not support Pitcher was terminated because of any report she made, arguing Pitcher testified she was terminated for leaving the pharmacy unattended, it is clear from the evidence that Pitcher's position was that Appellants' allegation that she left the pharmacy unattended was pretextual and a ruse for retaliation. Throughout trial Pitcher's position was that, soon after her reports of concern, the retaliation started, culminating in termination five months after she made her concerns known.

When establishing a causal connection between the protected activity and the termination, "[p]roximity in time between the claim and discharge is a typical beginning point for proof of a causal connection." *Rebarchek*, 35 P.3d at 899. Proximity in time, however, is not the sole means of showing a causal connection, and where the employer's adverse action is not closely connected in time to the protected conduct, additional evidence will be necessary to show a causal connection. *Id.* The Kansas Supreme Court stated in *Rebarchek v. Farmers Co-op. Elevator* that, "The passage of slightly more than 5 uneventful months before Rebarchek was discharged probably approaches the limit that would be recognized as part of a pattern for the purpose of establishing a causal connection between the protected activity and termination." *Id.* at 900.

Appellants do not challenge *Rebarchek* but contend that they presented evidence of a legitimate, nonretaliatory reason for Pitcher's discharge which, under Kansas law, caused the burden to shift back to Pitcher to present evidence that Appellants' reasons for Pitcher's dismissal were pretext. Appellants argue that Pitcher presented no evidence to satisfy this burden. We disagree. Although Appellants presented alleged nonretaliatory reasons for issuing Pitcher a "Last Chance Agreement," placing Pitcher on administrative leave, and ultimately terminating Pitcher,

24

Pitcher disputed these allegations and the evidence was such that a reasonable juror could have believed that Appellants' reasons for termination were pretextual.

Steve Cobb's testimony was that on July 26, 2016, he issued Pitcher a performance evaluation stating that Pitcher's performance, "Exceeds expectations"; the evaluation included Pitcher's leadership performance. Cobb testified that, the allegations leading to Pitcher being issued the Last Chance Agreement included that Pitcher had issues with arriving to work on time, came to work in pajamas, brought her dog to the pharmacy, and mistreated outside employees who visited the pharmacy as well as employees within the pharmacy. Cobb testified that he consulted human resources, Andre Jackson, for advice, and thereafter issued the Last Chance Agreement to Pitcher. He testified that he had no discussions with Pitcher regarding the allegations prior to issuing the Last Chance Agreement and that Pitcher denied all impropriety except for possibly agreeing that she had some issues with attendance. With regard to placing Pitcher on administrative leave, Cobb testified that Kierstin Starling sent Cobb a video of the pharmacy parking lot where Pitcher's car was absent, and also video of various rooms in the pharmacy to show Pitcher was absent, as well as the open pharmacy door, and a snapshot of the alarm panel showing it was unset. Cobb testified that Pitcher admitted leaving the pharmacy to take care of patients. Cobb testified that he sought corporate pharmacy video in investigating, but all video feeds were nonfunctional.

Pitcher testified that it was unusual in Starling's video that Pitcher's computer was on because she would typically lock it when she left. She stated that the video also did not show all parking spaces available, and Pitcher often parked in spots that were not shown on the video. Further, the video did not show the bathrooms which were behind walls. The evidence showed that Cobb was in regular communication with Starling and that Starling often worked on special

25

projects for Cobb. Cobb acknowledged receiving an email from Pitcher on November 1, 2016, wherein Pitcher stated that Starling admitted, since August, to lying about Pitcher because she was pressured and coerced to do so. Cobb could not recall if he spoke with Pitcher about that email. It was on November 8, 2016, Cobb received the video from Starling alleging Pitcher had left the pharmacy unsecured.

We find that Pitcher presented substantial evidence from which a reasonable juror could conclude that Appellants' purported reasons for terminating Pitcher were pretextual, and that Pitcher was terminated for reporting her concerns.

Appellants' third point on appeal is denied.

## Point IV - Separation Agreement

In Appellants' fourth point on appeal, Appellants contend the trial court abused its discretion in admitting evidence of the Separation Agreement Appellants offered Pitcher arguing that agreement was an offer of settlement and that admission of the proposed release within that agreement prejudiced the jury against Appellants.

"'We review the trial court's admission or exclusion of evidence under a deferential standard of review.'" *McGuire v. Kenoma*, LLC, 375 S.W.3d 157, 183-184 (Mo. App. 2012) (quoting *Ziolkowski v. Heartland Regional Medical Center*, 317 S.W.3d 212, 216 (Mo. App. 2010)). On appellate review, the issue is not whether the evidence was admissible or should have been excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence. *McGuire*, 375 S.W.3d at 184. "A circuit court has broad discretion in determining the admission of evidence [.]" *Lewellen v. Franklin*, 441 S.W.3d 136, 149 (Mo. banc 2014). A court abuses its discretion only when the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful

26

consideration." *State v. Johnson*, 207 S.W.3d 24, 40 (Mo. banc 2006). "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." *State v. Quick*, 334 S.W.3d 603, 609 (Mo. App. W.D. 2011). We "will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo. App. 2009).

> Because settlements are encouraged under the law, the general rule is that evidence procured from settlement is to be excluded at trial. Such evidence is normally excluded because a party making a settlement offer should not be penalized by revealing an offer to the jury if negotiations fail. Allowing evidence of settlement and negotiation to come before the jury creates a possibility of bias that has no place in our system of justice. The jury could perceive the offering party as admitting guilt or conceding harm and the jury could perceive the refusing party as stubborn, greedy, or mean spirited. The jury could also be confused by a compromise position acceptable for settlement, but less favorable than the result a party might seek at trial.

*Hancock v. Shook*, 100 S.W.3d 786, 799 (Mo. banc 2003) (internal quotation marks and citations omitted).

We find no abuse of discretion as we cannot conclude this was an offer of settlement as contended by Appellants. The "Separation Agreement" offered Pitcher four weeks' pay "as salary continuance," along with an agreement that the employers would not disparage Pitcher or provide reference information except for salary and dates of employment. The Agreement had a "non-admission" clause wherein it stated that the agreement was not an admission by Employer that any action taken during Employee's employment was wrongful or unlawful in any manner. In exchange, Pitcher would agree that she had received all compensation and benefits due her. Pitcher would agree that she would not disparage the employers or anyone associated, would keep business information confidential, and release the employers from any and all liabilities and claims, whether known or unknown.

27

Andre Jackson testified that offering the separation agreement had nothing to do with the medication issue/dispute Pitcher raised, and that separation packages are routinely offered as a matter of course when employees separate from Acaria. Jackson testified that, even if Pitcher had stolen from the company, taken personnel files, taken medical information, or stole personnel information, it was "Centene's practice" to still provide an employee who engages in that kind of conduct a separation package. Kenyata Virgil testified to the same. She testified that, even in light of allegations that Pitcher had stolen files and personnel records, violated HIPAA, and damaged video equipment, it was company practice to provide a severance. She could not think of a disqualifying event that would render an employee ineligible for severance.

Appellants rely on *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 965 (8th Cir. 2011), and *Chase Third Century Leasing Co., Inc. v. Williams*, 782 S.W.3d 408, 412 (Mo. App. 1989), for the proposition that the separation agreement was an offer of settlement. Yet, Appellants' own employees testified that the offer had nothing to do with Pitcher's reports of concern and that it was Acaria's and Centene's routine practice to offer such an agreement, regardless of the circumstances of an employee's dismissal.[7] Here, the trial court necessarily concluded that the Separation Agreement was not an offer of settlement as contended by Appellants, and nothing in the record supports that this was an offer of compromise of an existing controversy. The character

---

[7] *Weems* found that "Tyson sent the separation agreement to Weems after Tyson removed Weems from her position and inferentially in response to her expressed concerns over the circumstances of her removal." 665 F.3d at 965-966. In *Chase*, Ronald Williams defaulted on the lease of a copy machine and was sent a notice as to the accelerated balance due on the lease with a demand for payment of $4,284.94. 782 S.W.2d at 410. Williams took no action. *Id.* Chase took possession of the copier and sent a formal "Notice of Repossession and Intent to Either Sell or Dispose of Equipment" advising Williams that he had fifteen days to pay the amount due or the equipment would be sold. *Id.* Williams took no action. *Id.* After Chase took bids on the copier and sent Williams notice that it would be sold to the high bidder, Williams sent a letter to Chase offering to purchase the copier for $2,570.63. *Id.* at 411. Chase did not respond. *Id.* The trial court excluded Williams' letter as an offer of settlement. *Id.* at 412. This court affirmed the trial court's exclusion of the letter on the grounds that the letter was an offer of compromise of an existing controversy. *Id.* at 412-413.

28

of and circumstances surrounding the Separation Agreement necessitated that factual determinations be drawn, and we defer to the trial court's factual conclusions. The court's conclusions were supported by substantial evidence as Appellants' employees who offered the agreement to Pitcher testified that the agreement was wholly separate from any concerns raised by Pitcher. Hence, we cannot find the court's admission of the separation agreement to be arbitrary or unreasonable such that the court abused its discretion in allowing it into evidence.

Appellants' fourth point on appeal is denied.

### Point V – Exclusion of ADT Report

In their fifth point on appeal, Appellants contend the trial court erred in excluding evidence of an ADT report, arguing that Appellants were entitled to admission of the report as rebuttal evidence showing Pitcher left the pharmacy unsecured. Appellants contend that Pitcher was fired for leaving the pharmacy unarmed, and the ADT report proves that Pitcher did not secure the pharmacy when she left in the middle of the day to go to Wal-Mart.

The record shows that Pitcher's counsel raised the issue of the ADT report with the court and opposing counsel at trial, stating that Pitcher received from Appellants a copy of the ADT report just before trial. Pitcher's counsel asked opposing counsel, "[D]o you intend to introduce that into evidence at any point?" Counsel's response was, "I believe there's a strong possibility that we will introduce that into evidence." Pitcher's counsel asked, "With what witness?" Appellants' counsel responded, "We're still considering which witness." Pitcher's counsel then asked the court to exclude the report as a discovery violation as it was relevant to the issues and Pitcher had not been provided the document until one week before trial and after depositions. Appellants countered that they were unaware of the report until just before trial, as the security company supplying the report was not a party to the case and, therefore, the report was not under

29

Appellants' custody and control. Appellants claimed the report was never sought by Pitcher, a point disputed by Pitcher's counsel with reference to discovery requests. Regardless, Appellants contended Pitcher could not claim she was surprised by the report because she was aware of it before trial. Further, that it was not until one month before trial that they learned Pitcher was denying leaving the pharmacy unsecured, which prompted them to seek out this ADT document. Pitcher's counsel argued that Pitcher had always denied she left the pharmacy open and there was not one document Appellants could point to where she admitted leaving the pharmacy open. Pitcher's counsel argued that, even by filing the lawsuit she denied leaving the pharmacy unattended because leaving it open would have been a legitimate reason for her termination. Pitcher's counsel argued that, in depositions, the Appellants claimed that their decision to terminate was solely based on security systems and door sensors maintained by Centene. Appellants were now producing documents that Pitcher's counsel had not had the opportunity to cross-examine anyone about. The court ruled the document would be excluded.

We find that Appellants failed to preserve this issue for review. "To properly preserve a challenge to the trial court's exclusion of evidence the proponent of the evidence must attempt to present the excluded evidence at trial, and if the evidence remains excluded, then the proponent is required to make an offer of proof." *Payne v. Fiesta Corporation*, 543 S.W.3d 109, 122 (Mo. App. 2018) (internal quotation marks and citations omitted). While Appellants argue on appeal that the evidence was proper rebuttal evidence and Pitcher opened the door to its introduction, with Pitcher being aware of the evidence prior to trial, nothing in the record shows Appellants ever attempted to offer the evidence; Appellants concede they made no offer of proof. While it is true that offers of proof are irrelevant when the evidence is excluded as a sanction, and Pitcher argued it should be excluded as a discovery violation, in this case its admission was never attempted at all. At the

30

time the evidence was discussed, Appellants could not articulate who would testify to the evidence or if it would definitely be offered with Appellants' counsel stating, "I believe there's a strong possibility that we will introduce that into evidence." It was Pitcher's counsel who first raised the issue of the existence of the document with the court and, while not labeled as such, Pitcher's counsel's request to exclude the evidence was essentially a motion in limine. "The court's ruling on a motion in limine is interlocutory and subject to change during the course of the trial. By itself, a motion in limine preserves nothing for appeal." *Id.* (internal quotation marks and citations omitted).

Even if the issue was preserved, Appellants fail to prove exclusion of the evidence for a discovery violation was improper. "'We review the trial court's admission or exclusion of evidence under a deferential standard of review.'" *McGuire*, 375 S.W.3d at 183-184 (quoting *Ziolkowski*, 317 S.W.3d at 216). "'On appellate review, the issue is not whether the evidence was admissible, it is whether the trial court abused its discretion in excluding the evidence.'" *Id.* "A circuit court has broad discretion in determining the admission of evidence and imposing sanctions for discovery violations." *Lewellen*, 441 S.W.3d at 149. A court abuses its discretion only where the court's ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Johnson*, 207 S.W.3d at 40. "If reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." *Quick*, 334 S.W.3d at 609.

Given the argument and evidence before the court, it was not unreasonable for the court to believe that Appellants were long aware of Pitcher's contention that she never left the pharmacy unattended and could have obtained and disclosed the ADT report sooner. It was not unreasonable for the court to disbelieve Appellants' argument that the document was not under their custody or

31

control such that they could have obtained and produced it sooner, particularly with ADT being a security company Appellants apparently contracted with. Moreover, even if Appellants had preserved this point for appeal, Appellants have failed to show the court abused its discretion in excluding the document.

Point V is denied.

## Point VI – Court's Authority to Award Front Pay

In Appellants sixth point on appeal, Appellants contend the court erred in awarding Pitcher front pay, arguing the trial court had no authority to make such an award because Pitcher failed to properly plead a request for front pay in her petition.

We note that, at trial, Appellants did not argue that Pitcher's Petition failed to plead entitlement to front pay. Rather, Appellants disputed Pitcher's claim that, under Kansas law, the issue of front pay was a jury question; Appellants argued front pay is an equitable remedy to be decided by the court and not the jury. In a Motion in Limine filed by Appellants, Appellants requested that Pitcher be prevented from referencing front pay before the jury. In that same Motion in Limine, Appellants requested that any evidence offered at trial to support theories not raised in Pitcher's Petition be excluded, however Appellants only stated a concern that Pitcher would attempt to expand her wrongful termination allegations to suggest Appellants engaged in Medicaid fraud. Front pay was not mentioned as not having been raised by Pitcher. Both parties submitted trial briefs on this issue and nowhere in this briefing did Appellants allege front pay had not been pleaded.[8] The court sided with Appellants, ultimately determining that the court, and not the jury, would decide whether Pitcher was entitled to front pay.

---

[8] "[P]arties are bound by the positions they took at trial, and cannot obtain relief on appeal based on an error in which, by their own conduct, they joined or acquiesced." *Percy's High Performance, Inc. v. Krough*, 445 S.W.3d

32

Under Pitcher's Kansas common law retaliatory discharge claim, Pitcher's Petition alleged "Defendants' conduct has directly and proximately caused Plaintiff damages including, but not limited to lost wages, lost benefits, humiliation, stress, anxiety, and other emotional distress." Pitcher requested compensatory and punitive damages, among other things, and for such other relief the court deemed just and proper. Appellants contend that this pleading is insufficient to allow an award of front pay. We find that we need not reach this issue because the record reflects that, even if Pitcher's request for front pay was not properly pleaded as alleged by Appellants, Pitcher's entitlement to front pay was tried by implied consent of the parties. Rule 55.33(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."[9] "[G]ranting relief not specifically prayed for in the pleadings is appropriate only if it resolves issues raised by the allegations in the cause pleaded." *City of Greenwood v. Martin Marietta Materials, Inc.*, 311 S.W.3d 258, 264 (Mo. App. 2010) (internal quotation marks and citations omitted). "The relief granted must be fully supported by the facts which were either pleaded or tried by consent." *Id.* Here, the factual issues surrounding front pay, and Pitcher's entitlement to front pay, were tried by implied consent.

Appellants' sixth point on appeal is denied.

**Points VII & VIII– Appropriateness of Front Pay and Front Pay to Retirement Age**

---

577, 581 (Mo. App. 2013). Consequently, we disagree with Appellants' claim on appeal that they preserved for review their allegation that the court lacked authority to award front pay by raising it after trial in their "Motion for Remittitur or Amend Judgment." The record reflects that the first time the issue appears to have actually been raised was after trial in legal briefing provided the day before the evidentiary hearing on front pay.

[9] All rule references are to the Missouri Court Rules (2019) unless otherwise noted.

In Appellants' seventh point on appeal, Appellants contend front pay was inappropriate under the circumstances because Pitcher was already adequately compensated with actual and punitive damages. In their eighth point on appeal, Appellants argue that awarding front pay to retirement age was unduly speculative and, therefore, excessive.

> Both the trial court's decision to award front pay and its decision as to the amount of front pay are subject to review only for abuse of discretion. *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir.2002). Front pay is decided by the court, not the jury. *Id.* Reinstatement is the preferred remedy for unlawful employment discrimination, and front pay is the disfavored alternative, available only when reinstatement is impracticable or impossible. *Id.* at 572.

> Trials should be conducted to allow claims at law to be tried to a jury, with the court reserving for its own determination only equitable claims and defenses, which it should decide consistently with the factual findings made by the jury. *State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462, 473 (Mo. banc 2004). When reinstatement is not feasible, the court may grant front pay as an alternative equitable remedy. *Altenhofen v. Fabricor, Inc.*, 81 S.W.3d 578, 594 (Mo.App. W.D.2002).

*Brady v. Curators of University of Missouri*, 213 S.W.3d 101, 113-114 (Mo. App. 2006). "As an equitable remedy, the decision to award or deny front pay falls within the discretion of the trial court." *Gilliland*, 273 S.W.3d at 524.

Appellants argued to the trial court that Pitcher had already been adequately compensated by the jury award, and that front pay would be inappropriate and excessive. Appellants argued that it was highly unlikely Pitcher would have remained employed by Appellants in the future, and they would have terminated her regardless of the complaint she made due to Pitcher leaving the pharmacy open. Appellants argued that Pitcher had proven she could make comparable income, and that, if front pay was awarded, it should not exceed one year. On appeal, Appellants reargue these points, avoiding facts favorable to the court's determination and ignoring the factual findings

in the court's Judgment. The court issued nearly ten pages of findings and conclusions on the issue of front pay, and Appellants make little attempt to dispute the content of the court's Judgment.

In awarding compensatory damages, the jury was only asked to award damages for injuries Pitcher had already sustained. "When the claim is for wrongful termination, an award of lost wages is for wages that the plaintiff would have earned while employed by the defendant but for the discrimination – that is back pay and front pay." *Mickey v. BNSF Ry. Co.*, 437 S.W.3d 207, 214 (Mo. banc 2014) (abrogated on other grounds). Appellants cannot claim the jury addressed front pay in its award because Appellants ensured this issue was reserved for the court. The court found that Appellants did not dispute Pitcher's economic loss projections and relied on cross examination to support its affirmative defense of mitigation. The court was obligated to award front pay in accord with the jury verdict, and the jury's award of both actual and punitive damages reveal the jury's sentiment with regard to Appellant's illegal conduct. It is not within our province to reweigh the evidence and we defer to the trial court's credibility and factual determinations.

We find that the cases relied upon by Appellants do not support Appellants' essential argument that front pay was inappropriate because actual and punitive damages were awarded.

In *Gilliland*, while the trial court found that front pay was unnecessary because the jury's award sufficiently compensated Gilliland for his loss, our Supreme Court concluded that it need not ascertain whether the trial court abused its discretion in *refusing* front pay because the trial court could not grant equitable relief on findings of fact that differ from the jury's decision. 273 S.W.3d at 524. The Court concluded that no equitable relief was available because there was no jury finding in Gilliland's favor on any of his human rights act claims. *Id.* Here, the jury found in Pitcher's favor on her common law retaliatory discharge claim.

In *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992), the court remanded for a determination as to whether the employee/employer relationship was irreparably damaged, citing in the record that the employer had asserted that the employee was a qualified and competent employee capable of resuming work at the company with little evidence of ill will. An award of front pay is only appropriate if the reinstatement is impracticable or impossible. *Id.* As a part of that decision the court noted that the record was also not clear as to whether the court considered the propriety of the front pay awarded in light of the liquidated damages award. *Id.* [10] Here, Appellants placed this issue squarely before the court by arguing that front pay was inappropriate in light of the punitive damages award.

In *Hadley v. VAM PTS*, 44 F.3d 372, 376 (5th Cir. 1995), the court's review was for denial of front pay. The lower court denied front pay on the grounds that, because of the large amount of punitive damages awarded Hadley, an award of front pay would be inappropriate and excessive. *Id.* Hadley was awarded punitive damages on two grounds, violation of Title VII and intentional infliction of emotional distress. The 5th Circuit reversed and remanded for reconsideration of the court's denial of front pay when it reversed the jury's punitive damage award on the intentional infliction of emotional distress claim when Hadley failed to asked the jury for actual damages, a prerequisite to punitive damages. *Id.* In spite of Hadley receiving punitive damages on other grounds, the court remanded the lower court's denial of front pay for reconsideration stating,

> It may be that reversal of the punitive damages for intentional infliction of emotional distress will prompt a re-evaluation by the trial court of whether an award of front pay remains inappropriate and excessive. Without expressing any opinion

---

[10] Similarly, in *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990), the court remanded for recalculation of front pay when it found that no (or inadequate) consideration had been given to the fact that Hybert was awarded liquidated damages, and inadequate attention had been given to "the highly speculative nature of the front pay requested by and awarded to Hybert." *Id.*

on how the court's discretion should be exercised, we remand for reconsideration of front pay.

*Id.*

We conclude that Appellants have failed to prove the court abused its discretion in awarding front pay in light of the evidence before the court and the legal and factual conclusions drawn from that evidence.

Points VII and VIII are denied.

## Conclusion

We conclude that the trial court, 1) did not err in overruling Acaria's motion to dismiss for lack of jurisdiction as sufficient evidence in the record supports that the retaliatory discharge cause of action arose out of Missouri, and Acaria purposefully availed itself of the privilege of conducting activities within Missouri so as to establish minimum contacts within the State to satisfy due process, 2) did not err in overruling Centene's motion for judgment notwithstanding the verdict as the evidence presented at trial was sufficient to support that Centene was an employer of Pitcher, 3) did not err in overruling Appellants' motion for judgment notwithstanding the verdict in that Pitcher made a submissible case of retaliatory discharge, 4) did not err in admitting evidence of a separation agreement offered Pitcher, 5) did not err in excluding evidence of an ADT report, 6) did not err in considering the issue of front pay which was tried by consent, and 7) did not abuse its discretion in its award of front pay.

37

The circuit court's judgment is affirmed.


_____
Anthony Rex Gabbert, Judge


All concur.